FILED
APR 2 8 2011

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GLOBAL FINANCIAL & LEASING INC.,
an Oregon corporation,

　　　　　Plaintiff,

　　　　　　　　　　　　　　　　CV 10-1369-PK

　　　　　　　　　　　　　　　　OPINION AND ORDER

LOJY AIR COMPANY, an Egyptian
corporation,

　　　　　Defendant.

_____

PAPAK, Judge:

　　　Plaintiff Global Financial and Leasing Inc. ("Global") originally filed this action in state

court against defendant Lojy Air Company ("Lojy") arising from an agreement between the

parties concerning a potential future purchase and lease of an aircraft. Global's complaint alleges

a single claim for declaratory relief, asserting that Lojy materially breached the agreement, and

prays for an order declaring that it is entitled to keep the $300,000 deposit it received from Lojy

Page 1 - OPINION AND ORDER

as liquidated damages for Lojy's breach.  This court has original jurisdiction over Global's claim

under 28 U.S.C. § 1332 and removal jurisdiction under 28 U.S.C. § 1446(b).  Now before the

court are two motions.  The first is Lojy's motion for leave to file an amended answer (#16),

including new affirmative defenses, counterclaims, and a third-party complaint against Global's

president Richard Keith Ward ("Ward").  Also before the court is Lojy's motion for preliminary

injunction (#8) pursuant to Fed. R. Civ. P. 65 seeking an order requiring Global to place the

$300,000 deposit it received from Lojy into an interest-bearing escrow account.  I have examined

the parties' briefing and heard oral arguments in the matter.  For the following reasons, Lojy's

motion to amend is granted, and Lojy's motion for preliminary injunction is denied.


## BACKGROUND

Plaintiff Global is an Oregon-based aviation finance company, while Lojy is an Egyptian

aviation company.[1]  On January 25, 2010, Lojy's C.E.O. Galal Barakat and Global's president

Keith Ward signed a "Letter of Intent" (hereinafter "LOI") which purported to "outline[] the

basic terms and conditions upon which [Global] is willing to lease to [Lojy] one Airbus A320-

200 aircraft, . . . ." (Ward Decl., #15, Ex. 1 at 1.)  Overall, the LOI envisions a potential

transaction wherein Global would finance Lojy's acquisition of an aircraft.[2]  Global would

---

[1] For the purposes of this overview, I include only facts that appear in evidence presented
in the record before me on Lojy's motion for preliminary injunction.  Statements offered by
counsel at oral argument are not evidence.  Further, the factual allegations contained within
Lojy's proposed  amended answer, counterclaims, and third-party complaint – which today's
decision permits defendants to file– do not take the form of testimony, declarations, or affidavits
constituting evidence.

[2] A recent email from Global's president suggests that Global had planned to finance the
transaction by relying on "private equity sources."  (Barakat Decl., #10, Ex. C.)

purchase the aircraft from another entity and then lease it to Lojy, requiring Lojy to buy the plane at the end of the 10 year lease, but offering an option to purchase it sooner. *Id.* at 2, 5. To that end, the LOI describes some– but not all– of the terms and conditions that would eventually comprise a "definitive lease-purchase agreement" between Global and Lojy. The LOI identifies a specific aircraft, "serial number 630," to be leased. *Id.* at 1 (Section 1). The LOI also provides somewhat vaguely that "[t]he Aircraft is subject to final inspection, appraisal and approval by [Global.]" *Id.* Significantly, the LOI does not specify how much financing Global would provide. *Id.* ("The amount to be financed is to be determined.")

Sometime before the parties signed the LOI, Lojy paid Global $300,000 as an "initial deposit." (Barakat Decl., #10, ¶3.) The LOI acknowledges Global's previous receipt of the $300,000 deposit. (Ward Decl., #15, Ex. 1 at 3). The LOI describes that the initial deposit will be "applied to offset the Security Deposit as set out under Section 9 below." *Id.* Section 9, in turn, envisions that Global would use the security deposit during the term of a lease-purchase agreement to cover any of Lojy's missed payments, with the remainder to be refunded back to Lojy at the end of the lease term. *Id.* at 3 (LOI Section 9).

If, however, the lease-purchase agreement is not consummated, the LOI discusses two potential dispositions of the "initial deposit" depending on the parties' conduct. The LOI provides:

> In the event the Lease purchase agreement is not consummated at no fault of Lessor [Global], Lessee [LOJY] will pay all fees and expenses associated with the transaction, limited to the initial deposit. If the Lease purchase agreement is not consummated due to the fault of Lessor [Global], the initial deposit will be refunded to Lessee [LOJY].

*Id.* at 3 (LOI Section 7). Finally, in a separate section of the document, the LOI permits Global

to keep the entire "initial deposit as liquidated damages" in the event of "a breach of this agreement" by Lojy which "results in the termination of this agreement . . . ." *Id.* at 17 (LOI Section 17). Global's declaratory relief claim, and some of Lojy's proposed counterclaims, seek judicial determination of the parties' rights to the $300,000 initial deposit.

After Global and Lojy signed the LOI, and Lojy identified an available Airbus A320-200 aircraft, Global retained AVITAS, Inc. to produce a "desktop valuation report," or appraisal, of the particular aircraft. (Suppl. Barakat Decl., #19, Ex. 2 at 3-40). AVITAS described its task as "to provide its opinion as to the Base Value, Current Market Value, Distress Value, and Orderly Liquidation Value" for the aircraft. *Id.* at 3. AVITAS opined that the Base Value, or the "underlying economic value of [the] aircraft in an open, unrestricted, stable market environment with a reasonable balance of supply and demand" was $18.8 million. *Id.* at 3, 5. The appraisal estimated the Current Market Value, or "the most likely trading price that may be generated for an aircraft under the market conditions that are perceived to exist at the time in question," as $16.9 million. *Id.* at 4, 5. The appraisal approximated the Orderly Liquidation Value ("OLV"), defined as "the same as the Market Value definition above except that OLV is net of all brokerage fees, storage costs and other liquidation fees," at $15.2 million.[3] *Id.* at 4,5. Finally, the appraisal listed the Distress Value, or "the price at which an aircraft could be sold under abnormal conditions, such as an artificially limited market timing period, . . . the seller being under duress to sell, an auction, a liquidation, commercial restrictions, legal complications or other such facts . . ." as $12.7 million. *Id.* at 4,5.

---

[3] AVITAS recognized that Orderly Liquidation Value was not a term defined by the International Society of Transport Aircraft Trading (ISTAT), an industry trade group of aircraft appraisers.

There is some indication that the appraisal did not take into consideration all the specific technical aspects of the particular aircraft Lojy sought to acquire.  Although the appraisal acknowledged that Airbus A320 planes existed in various "marks" with differing engines, it did not appear to base its estimated values on the particular engines included on the serial number 630 aircraft. *Id.* at 19, 22 (generally using the A320-200 "family" of planes for its analysis). Thus, Emannuel Ballesteros, who described himself as Global's "representative" regarding its potential deal with Lojy, criticized the appraisal for failure to consider that the serial number 630 aircraft had a "-5b" engine which "gives more power than the -5A normally installed in a A320...." (Suppl. Barakat Decl., #19, Ex. 3 at 2.)  Ballesteros also faulted the appraisal for failing to consider that the serial number 630 aircraft was undergoing an inspection costing the current owner approximately $2 million. *Id.*

Even more than the potential deficiencies in the appraisal itself, Lojy objects to the way Global used the appraisal to determine the amount it would finance.  There is some indication that the seller sought $17.5 million for the aircraft.  (Suppl. Barakat Decl., #19, Ex. 3 at 2.)  At the very least, it is clear that the proposed purchase price substantially exceeded the estimated orderly liquidation value of $15.2 million.  (Ward Decl., #15, ¶3.)  On February 22, 2010, Emmanuel Ballesteros wrote an email to Global encouraging it to offer to purchase the aircraft for $15.2 million, the orderly liquidation value.  (Suppl. Barakat Decl., #19, Ex. 3 at 2.)  Global apparently did not take Ballesteros' suggestion.[4]  Two days later, on February 24, 2010, Lojy's C.E.O. (Barakat) emailed Global's president (Ward) reporting that Lojy had decided to

---

[4] Later emails, discussed more below, suggest that Global offering to proceed with the purchase if Lojy provided a bank guarantee for the difference between the orderly liquidation value and the purchase price.

Page 5 - OPINION AND ORDER

"terminate the LOI" and requested return of Lojy's security deposit. (Ward Decl., #15, Ex. 5 at

1.) On March 22, 2010, Ward emailed Barakat confirming his offer to proceed with the purchase

if Lojy provided a bank guarantee "to make up the difference in appraised value and selling

price."[5] (Ward Decl., #15, Ex. 2 at 1.) Ward also offered to consider financing a different

aircraft with "a more realistic pricing structure." *Id.* Although Ward perceived that Lojy was

amenable to obtaining a guarantee, an April 8, 2010 email from Ward to Barakat suggests that

Lojy was unwilling to do so. (Ward Decl., #15, Ex. 3 at 1.) Barakat now disputes the propriety

of Global's reliance on the orderly liquidation value to determine the limit of its financing,

asserting that "the most common and 'standard' valuation method for determining the price of an

aircraft in a commercial setting is market value or base value." (Suppl. Barakat Decl., #19, ¶2.)

On April 14 2010, Lojy still expressed an interest in financing a plane through Global, but

asserted that Lojy would no longer participate in price negotiation and demanded that Global and

Ballesteros locate and purchase a plane in no more than 10 days, or else Lojy would terminate the

LOI and require refund of its deposit. This demand seemingly reversed the roles of the parties

under the LOI, which Lojy admits required it to "research, identify, and present Global with

Airbus aircraft purchase opportunities...."[6] (D.'s Br., #9, at 6.) The next day, Global rejected

Lojy's proposal and time-frame and reasserted that the LOI was still in effect. (Ward Decl., #15,

Ex. 4 at 2-3.) On April 15 and 16, 2010, Barakat and Ward exchanged emails in which Barakat

objected to the appraisal methodology and Ward asserted that Lojy's demands constituted a

---

[5] Ward's reference to "appraised value" apparently refers to the appraised Orderly
Liquidation Value.

[6] Despite this admission, neither Global nor Lojy point to language in the LOI that
specifies which party was responsible for identifying potential aircraft for purchase.

breach of the LOI. (Ward Decl., #15, Ex. 4 at 1-2.) On April 18, 2010, even before Lojy's ten

day time-frame had expired, Barakat requested refund of the initial deposit. (Ward Decl., #15,

Ex. 4 at 1.) Ward responded that Barakat's request for a refund was "referred to legal counsel for

processing." (Ward Decl., #15, Ex. 6 at 2.) On April 19, 2010, Barakat wrote Ward to clarify

that although Lojy requested a refund of the deposit, the LOI was still active and that Lojy still

wanted to do business with Global. *Id.* Barakat reiterated that assertion on April 21, 2010. *Id.* at

2.

       No lease-purchase agreement was consummated and Global never returned the $300,000

deposit to Lojy. Instead, on September 3, 2010, Global filed an action in state court requesting a

declaratory judgment that it was entitled to retain the entire initial deposit as liquidated damages

for Lojy's breach of the LOI. (Notice of Removal, #1, Ex. 1.) On October 29, 2010, Barakat

emailed Global proposing several "options" for resolving the dispute, including continuing to

work with Global to acquire an appropriate aircraft. Lojy removed the action to this court on

November 5, 2010. (Notice of Removal, #1.) On February 17, Lojy moved for a preliminary

injunction requiring Global to place the $300,000 deposit into an interest-bearing escrow

account, fearing that Global and its president Keith Ward would use the deposit to pay off

pending tax liens and judgments or would file for bankruptcy.[7] (Barakat Decl., #10, ¶9, Ex. B.)

Lojy, however, had not yet filed any counterclaims when it moved for a preliminary injunction.

On March 14, 2011, Global acknowledged that its current cash and bank account balance was

approximately $62,000. (Ward Decl., #15, ¶10.) Finally, on April 1, 2011, less than a week

---

[7] Lojy continued to pursue a lease-purchase agreement with Global, even after moving for
a preliminary injunction. (Ward Decl., #15, ¶11.)

before oral argument, Lojy filed its reply brief supporting its motion for preliminary injunction and simultaneously moved for leave to file an amended answer, including specific denials of Global's allegations and, for the first time, counterclaims against Global and "third party" claims against Ward.

## LEGAL STANDARDS

### I.   Motion to Amend

A party may amend a pleading once as a matter of course before being served with a responsive pleading or within 20 days after serving the pleading but thereafter may only amend by consent of the opposing party or leave of the court. Fed. R. Civ. P. 15(a). "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend is within the discretion of the trial court, but that discretion "should be guided by the underlying purpose of Rule 15(a) which was to facilitate decisions on the merits, rather than on technicalities or pleadings." *In re Morris*, 363 F.3d 891, 894 (9th Cir. 2004) (citation omitted). "A district court may, however, take into consideration such factors as bad faith, undue delay, prejudice to the opposing party, futility of the amendment, and whether the party has previously amended his pleadings." *Id.* (citation omitted). Of these factors, the most important is the potential for prejudice to opposing parties. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330-31 (1971). While futility alone provides sufficient grounds for denying a motion to amend, *see Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004), undue delay by itself cannot justify denial of a motion to amend. *See Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999). "An outright refusal to grant leave to amend without a justifying reason is . . . an abuse of discretion." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1034 (9th Cir. 2008) (citation

omitted).

## II.    Motion for Preliminary Injunction

A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L.Ed. 2d 162 (1997). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," and it is generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits. *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981); *Tanner Motor Livery, Ltd. V. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1983); *see also Regents of University of California v. ABC, Inc.*, 747 F.2d 511, 514 (9th Cir. 1984) ("the function of a preliminary injunction is to preserve the status quo *ante litem*") A party seeking preliminary injunctive relief must demonstrate: (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7(2008). Although *Winter* overruled certain Ninth Circuit precedent allowing courts to grant injunctions based on a "sliding scale" when there was only a "possibility" of irreparable harm, recent Ninth Circuit case law holds that the "sliding scale" approach survives *Winter* to the extent that "serious questions going to the merits" and a balance of hardships that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

## DISCUSSION

Page 9 - OPINION AND ORDER

I.      **Motion to Amend**

Lojy seeks to amend its answer to include specific denials of Global's allegations, counterclaims against Global, and "third party" claims against Ward.  Global argues that granting leave to amend and allowing Lojy's proposed counterclaims to serve as the basis for granting Lojy's motion for preliminary injunction would prejudice Global by effectively denying it the opportunity to respond to Lojy's actual counterclaims.  Global, however, concedes that Lojy's proposed amendments are appropriate so long as the court denies Lojy's preliminary injunction motion, and thus, ensures that Global suffers no prejudice.  Since I deny Lojy's motion for preliminary injunction in today's decision, Global will suffer none of the prejudice it alleges from Lojy's amendment.  Consistent with the liberal amendment standard in Rule 15, Lojy's motion to amend is granted.  *See* Fed. R. Civ. P. 15(a)(2).

II.     **Motion for Preliminary Injunction**

Lojy seeks a preliminary injunction ordering Global to place the $300,000 deposit it received from Lojy into an interest-bearing escrow account until adjudication on the merits.  Global resists the preliminary injunction on several grounds.  First, Global contends that a preliminary injunction freezing assets cannot issue here because the district court only has jurisdiction to freeze assets on the basis of equitable claims, and Lojy's equitable claims are precluded by the presence of the LOI, a legally enforceable contract concerning the disputed $300,000 deposit.  Second, Global argues the even if the court could order injunctive relief, it would not be warranted because Lojy cannot satisfy the applicable standards for injunctive relief on any of its counterclaims.  Although I take a slightly different approach, I find Global's arguments generally persuasive, and accordingly, I deny Lojy's motion for preliminary

injunction.

### A.    Authority to Grant Preliminary Injunction

Jurisprudence on the district court's authority to issue asset-freezing injunctive relief derives from three seminal Supreme Court decisions.  In *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940), the Supreme Court ruled that a district court possessed the power to enjoin a defendant from transferring a specificied amount of money where the plaintiff alleged claims seeking both money damages and equitable remedies, since an injunction freezing assets was a reasonable measure to preserve the *status quo* pending a final determination of the plaintiff's equitable claims.  In *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212 (1945), the Court recognized the general principles it laid out in *Deckert*, particularly that a "preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally," but denied an asset-freezing injunction meant to prevent defendants from taking assets outside of the country, since the suit pertained to antitrust violations and, thus, the injunction dealt with "a matter lying wholly outside the issues in the suit." *Id.* at 220. Finally, in *Grupo Mexicano de Desarrollo v. Alliance Bond Fund*, 527 U.S. 308 (1999), the Supreme Court approved of *De Beers* but distinguished *Deckert*, holding that a federal court lacks the authority to issue injunctive relief freezing assets in actions for money damages in which no lien or equitable interest is claimed.  *Grupo Mexicano de Desarrollo v. Alliance Bond Fund*, 527 U.S. 308 (1999).

The most thorough analysis of these cases can be found in *United States ex rel. Rahman v. Oncology Associates P.C.*, 198 F.3d 489(4th Cir. 1999).  There, the Fourth Circuit upheld a prejudgment asset-freezing injunction where the plaintiff (the United States) presented facts

showing that the defendant health care providers had defrauded federal health care insurance

programs and were transferring assets to protect themselves from liability, and also alleged

claims for both money damages and equitable relief.   *Rahman*, 198 F.3d at 493.   In affirming the

injunction to freeze assets, the Fourth Circuit agreed with the district court that when "both

money damages and equitable relief are sought . . . , the controlling authority is not *Grupo*

*Mexicano* but *Deckert*. . . ." *Id.* at 492.   The Fourth Circuit also condensed the Supreme Court's

jurisprudence into several general principles:

> First, where a plaintiff creditor has no lien or equitable interest in the assets of a
> defendant debtor, the creditor may not interfere with the debtor's use of his property
> before obtaining judgment. A debt claim leads only to a money judgment and does not in
> its own right constitute an interest in specific property. Accordingly, a debt claim does
> not, before reduction to judgment, authorize prejudgment execution against the debtor's
> assets.
>
> . . . . .
>
> On the other hand, when the plaintiff creditor asserts a cognizable claim to specific assets
> of the defendant or seeks a remedy involving those assets, a court may in the interim
> invoke equity to preserve the status quo pending judgment where the legal remedy might
> prove inadequate and the preliminary relief furthers the court's ability to grant the final
> relief requested. This nexus between the assets sought to be frozen through an interim
> order and the ultimate relief requested in the lawsuit is essential to the authority of a
> district court in equity to enter a preliminary injunction freezing assets.

*Id.* at 496.

The *Rahman* court also created a two-part inquiry applying those principles, first

analyzing whether the complaint's claims seek cognizeable relief in equity involving specific

assets of the defendant, and second determining whether a preliminary injunction freezing assets

would be a reasonable measure to preserve the status quo in aid of the ultimate equitable relief

claimed. *Id.* at 497.   Numerous district courts have since adopted *Rahman*'s analytical approach.

*See, e.g., Newby v. Enron Corp.*, 188 F.Supp.2d 684, 696-97 (S.D. Tex. 2002); *Fairview Maching & Tool Co., Inc. v. Oakbrook Int'l, Inc.*, 77 F.Supp.2d 199, 204 (D. Mass. 1999); *Matrix Partners VIII, LLP v. Natural Resource Recovery, Inc.*, 2009 WL 175132 (E.D. Tex. 2009). Moreover, the Ninth Circuit has indirectly approved of *Rahman*'s approach, even where equitable relief is not the "true gravamen" of the complaint. *See Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 & n.4 (9th Cir. 2003). Accordingly, I apply this framework to analyze whether Lojy's equitable claims are cognizeable and whether they allege a sufficient nexus to the defendant's assets. If both these inquiries are answered in the affirmative, this court has the authority to freeze assets to aid in granting the ultimate equitable relief Lojy seeks.

### B.    Lojy's Equitable Counterclaim

The Oregon Supreme Court recognizes quasi-contract as one of two parallel means of "accomplishing substantial justice by preventing unjust enrichment and forcing restitution to the plaintiff of something which in equity and good conscience did not belong to the defendant."[8] *Derenco v. Benj. Franklin Fed. Sav. and Loan*, 281 Or. 533, 558, 577 P.2d 477 (1978). Quasi-contract is a remedy at law properly used when "the possession of no specific identifiable property is sought and only a money judgment is requested." *Id.* Despite being labeled a legal remedy, the Oregon Supreme Court recognizes that the form of quasi-contract most applicable

---

[8] The other means is a constructive trust, a remedy at equity which is proper "when there is some specific property identified as belonging to the plaintiff." *Derenco*, 281 Or. at 558 (finding "no need to resort to a constructive trust" where only a money judgment was requested). Lojy, however, has not alleged a counterclaim asking the court impose a constructive trust as an equitable remedy, despite the numerous references in briefing to Lojy's perception that Global held the initial deposit in "constructive trust" for Lojy.

here, "money had and received," is actually more akin to an equitable remedy. *See Powell v. Sheets*, 196 Or. 682, 700, 251 P.2d 108 (1952) ("The term 'money had and received' is the technical designation of a form of declaration in assumpsit, wherein plaintiff declares that defendant had and received certain money, etc. Although an action at law, an action for money had and received *is equitable in its nature and is governed by equitable principles*. It may, in general, be maintained whenever one has money in his hands belonging to another, which, in equity and good conscience, he ought to pay over to that other. Recovery in such case is based on a promise implied by law or quasi contract and on the equitable principle that one who has been unjustly enriched at the expense of another is required to make restitution.") (emphasis added). In particular, where a party uses the language of quasi-contract and also seeks an accounting, the case sounds in equity, not law. *Derenco*, 281 Or. at 558.

Here, Lojy's proposed answer asserts one cognizeable counterclaim in equity involving the $300,000 deposit that Global retained. Lojy's answer includes a counterclaim for "Unjust Enrichment" seeking disgorgement of "any gain" which Global and Keith Ward unjustly obtained. (Memo. in Supp. of Motion to Amend, #17, Ex. A, ¶¶61-63). Lojy also pleads a separate claim for "Accounting," seeking an accounting of all unjust gains.[9] (Memo. in Supp. of Motion to Amend, #17, Ex. A, ¶¶64-66.) Thus, Lojy's claim for unjust enrichment clearly can be understood as a claim for breach of a quasi-contract, and the inclusion of a request for accounting suggests that it sounds in equity rather than in law. Moreover, Lojy has pled facts supporting all the elements of a quasi-contract claim in its proposed amended answer. *See Robinowitz v. Pozzi*,

---

[9] The accounting counterclaim is more appropriately viewed in association with Lojy's unjust enrichment claim, not as a separate claim for relief.

127 Or. App. 464, 467, 872 P.2d 993 (Or. App.1994) (elements are: (1) a benefit is conferred; (2) the recipient is aware that a benefit has been received; and (3) it would be unjust to allow the recipient to retain the benefit without requiring the recipient to pay for it). Accordingly, Lojy's claim for unjust enrichment with its associated request for accounting is a cognizeable counterclaim sounding in equity.

Lojy's equitable counterclaim also alleges a sufficient nexus to the $300,000 deposit that is the subject of Lojy's proposed asset freeze. Although the unjust enrichment counterclaim does not specifically reference the deposit, it seeks disgorgement of "any gain ... unjustly obtained," which easily encompasses the $300,000 deposit described elsewhere in the proposed amended answer. Since both the requirements identified by *Rahman* are present, this court has the authority to order the injunctive relief requested by Lojy.

It is important to note that Lojy's fraud and conversion counterclaims do not provide authority for this court to order an asset freeze, since those counterclaims seek damages, not equitable relief. Oregon law is clear that a plaintiff bringing a fraud claim may choose to pursue either an equitable or a legal remedy. *See Federici v. Lehman*, 230 Or. 70, 72-73, 368 P.2d 611 (Or. 1962) (plaintiff "may either rescind the contract and be returned to his former position or he may affirm the contract and sue for the damages suffered by reason of the fraud"). If the plaintiff pursues damages through an action at law, the party guilty of the fraud is liable for any damages that "naturally and proximately" result from the fraud. *Selman v. Shirley*, 161 Or. 582, 609, 85 P.2d 384 (1938). Here, Lojy asserts precisely this type of fraud claim at law, seeking over $1,600,000 in money damages for "irreparable harm and loss" suffered as a result of Global and

Keith Ward's conduct attributable to loss of its deposit, expenses incurred, consequential damages, and lost profits. (Memo. in Supp. of Motion to Amend, #17, Ex. A, ¶55.)

Unlike with fraud, a plaintiff alleging conversion has no choice but to pursue damages. In fact, one of the elements of conversion is the "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to *pay the other the full value* of the chattel." *Mustola v. Toddy*, 253 Or. 658, 663–664, 456 P.2d 1004 (1969) (quoting Restatement (Second) of Torts §222A, at 431 (1965) and adopting that Restatement definition). Thus, the standard remedy for conversion is the market value of property at the time and place of conversion. *Austin v. Vanderbilt*, 48 Or. 206, 211, 85 P. 519 (1906); *see* Black's Law Dictionary (9th ed. 2009) ("trover" defined as "[a] common-law action for the *recovery of damages* for the conversion of personal property, *the damages* generally being measured by the property's value") (emphasis added). Thus, even if it is cognizeable, Lojy's conversion claim seeks damages, not an equitable remedy.

Accordingly, this court may only grant Lojy's preliminary injunction if its equitable counterclaim– as opposed to its other counterclaims– satisfies the traditional test for a preliminary injunction. *See S.E.C. v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005) ("the asset freeze is justified as a means of preserving funds for the equitable remedy"). If a preliminary injunction is not justified on the basis of Lojy's unjust enrichment counterclaim, issuing the injunction would contravene the Supreme Court's clear ruling in *Grupo Mexicano* that courts lack authority to grant preliminary equitable assistance in the collection of legal debts. *See Matrix Partners VIII, LLP v. Natural Resource Recovery, Inc.*, 2009 WL 175132, at*4,

(E.D.Tex.2009)(citing *Grupo Mexicano*, 527 U.S. at 325).

## III.   Test for Preliminary Injunction

Despite that this court has the authority to grant Lojy's motion for preliminary injunction, Lojy fails to meet the requirements for an injunction to issue on its unjust enrichment counterclaim.  The major obstacle to Lojy's success is the very presence of the LOI, which likely constitutes an enforceable contract at least concerning the disposition of Lojy's $300,000 initial deposit.

Oregon courts are clear that there cannot be both a valid legally enforceable contract and a quasi-contract concerning the same conduct.  *Ken Hood Const. Co. v. Pacific Coast Const., Inc.*, 203 Or.App. 768, 772 126 P.3d 1254 (Or. App. 2006); *Prestige Homes Real Estate Co. v. Hanson,* 151 Or. App. 756, 762, 951 P.2d 193 (Or. App. 1997).  Thus, although it is proper to plead contract and quasi-contract claims in the alternative, "the two theories are mutually exclusive." *Id*; *Kashmir Corp. v. Patterson*, 43 Or. App. 45, 48 602 P.2d 294 (Or. App. 1979). Consequently, an admission or judicial determination that a valid enforceable contract exists precludes recovery under a quasi-contract theory.  *See Kashmir*, 43 Or. App. at 48-49 (where a contract was pleaded and incorporated in plaintiff's complaint, defendants admitted the contract in their answer, and the enforceability of the contract was not in dispute, the action became one in contract and the quasi-contract claim was properly stricken); *Hanson,* 151 Or. App. at 762 (agreeing with trial court's determination that listing agreement was a valid contract and thus affirming trial court's dismissal of plaintiff's *quantum meruit* claim.)

Here, the parties still dispute which particular aspects of the LOI constitute an enforceable

contract.  Further, the court has not yet had occasion to definitely determine what aspects of the

LOI constitute a binding agreement.  Nevertheless, the evidence presented by the parties suggests

that the LOI at least constitutes an enforceable contract concerning the disposition of the

$300,000 initial deposit.  Although letters of intent are generally assumed to be nonbinding

expressions contemplating the terms of a future contract, *Remnick v. O.P.T.I.O.N. Care, Inc.*, 77

F.3d 309, 315 (9th Cir. 1996), Oregon courts examine the language of the letter of intent to

determine whether any of its provisions are enforceable.  *Logan D.W. Sivers Co.*, 343 Or. 339,

346-49, 169 P.3d 1255(Or. 2007).  For example, in *Logan*, the Oregon Supreme Court found

that, although the letter of intent was not a contract in its entirety, the letter clearly conveyed the

parties' intention to abide by three distinct promises described within it.  *Id.* at 347.  Further, the

Court determined that the terms of those promises were sufficiently definite to form a binding

contract.  *Id.*

Similarly, it is likely that the LOI in this case created a binding contract concerning the

treatment of the $300,000 initial deposit.  I read the LOI to express three potential dispositions of

the initial deposit upon failure to consummate a lease-purchase agreement: (1) if the failure is

Global's fault, Global returns the entire deposit to Lojy; (2) if the failure is Lojy's fault, Global

retains the entire deposit as liquidated damages; and (3) if neither party is at fault, Global retains

its fees and expenses associated with the failed transaction, returning the remainder of the deposit

to Lojy.  Importantly, these LOI terms concern money that had *already* been given to Global, not

a hypothetical deposit that would occur along with consummation of the lease-purchase

agreement.  Moreover, unlike much of the LOI that merely sketches the non-binding terms of a

potential future lease-purchase agreement, the parts of the LOI describing the initial deposit laid

out the obligations of the parties if they *failed* to consummate a later agreement.  In essence, the

parties expressly decided how to handle disposition of the initial deposit in the LOI, in

anticipation that the transaction might fall apart, as indeed occurred.  Thus, these terms provide

written evidence of the parties' manifestation of mutual intent to form a contract, at least

concerning disposition of the initial deposit.  *See Wooton v. Viking Distributing Co.*, 136 Or.

App. 56, 59, 899 P.2d 1219 (Or. 1995) (mutual intent can be demonstrated through writing of

parties).

     Moreover, Lojy C.E.O. Galal Barakat's conduct following their creation of the LOI

provides some additional evidence of at least Lojy's assent to contract.  *See Citibank S.D. N.A. v.*

*Santoro*, 210 Or. App. 344, 349, 150 P3d 429 (2006).  On several occasions in April 2010,

Barakat referred to terminating the LOI and requesting refund of the $300,000 deposit,

suggesting that he understood that the parties' failure to consummate the agreement envisioned

by the LOI triggered an obligation to return the deposit.  The parties could potentially present

additional evidence at a later stage indicating that no meeting of the minds occurred concerning

the disposition of the initial deposit.  The evidence before the court on this motion, however,

signals formation of a contract, and thus, Lojy's unjust enrichment counterclaim will likely be

dismissed.

     Lojy also does not satisfy the other three requirements for a preliminary injunction.  Lojy

has not presented persuasive evidence that it is likely to suffer irreparable harm in the absence of

injunctive relief.  An injunction can only maintain the *status quo*, and thus can freeze at most the

$62,000 that Global currently possesses in liquid assets.  The evidence presented by Lojy simply does not support its argument that  "Global's questionable financial history, debts owed, and misrepresentations" suggest that Global is likely to hide the $62,000 to avoid a potential judgment.  (D.'s Br., #9, at 9.)  The bankruptcy filings for Global were discharged over 10 years ago, and the tax liens pertain to Keith Ward, not Global.[10]  Additionally, the balance of equities does not clearly tip in Lojy's favor.  The evidence suggests that the parties failed to consummate a lease-purchase agreement because they had differing expectations about the amount of the aircraft's purchase price that Global would finance; Lojy apparently believed that Global should finance up to the full market value of the aircraft, while Global was apparently prepared to finance only up to the orderly liquidation value of the aircraft, requiring a bank guarantee for the difference.  Since the LOI explicitly leaves the amount to be financed unspecified, neither party is particularly blameless.  Finally, Lojy does not demonstrate that an asset freeze is in the public interest.  In fact, the Supreme Court described an asset-freezing preliminary injunction as the "nuclear weapon of the law" which "would manifestly be susceptible of the grossest abuse." *Grupo Mexicano*, 527 U.S. at 329-330 (internal citations and quotations omitted).  In sum, Lojy has failed to demonstrate the necessity of this extraordinary remedy.

## CONCLUSION

For the foregoing reasons, Lojy's motion for leave to file an amended answer (#16) is granted and Lojy is ordered to file immediately the amended answer as proposed.  Lojy's motion

---

[10] This distinction is relevant, since the court has not yet addressed whether Ward's and Global's conduct warrant piercing of the corporate veil.

Page 20 - OPINION AND ORDER

for preliminary injunction (#8) is denied.

Dated this 28th day of April, 2011.

Honorable Paul Papak
United States Magistrate Judge