**Philip S. Griffin,** OSB No. 872322
phil@griffinlawgroup.com
**GRIFFIN LAW GROUP LLC**
WORLD TRADE CENTER ONE
121 SW Salmon St., Suite1100
Portland, Oregon 97204
Telephone: 503.471.1306
Facsimile: 888-543-4806

Attorneys for Defendant Lojy Air Company

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| GLOBAL FINANCIAL & LEASING INC., <br><br> Plaintiff, <br><br> v. <br><br> LOJY AIR COMPANY, an Egyptian corporation, <br><br> Defendant, <br><br> v. <br><br> RICHARD KEITH WARD, Individually, <br><br> Third-Party Defendant. | Civil Action No. 3:10-CV-1369-PK <br><br> TRIAL MEMORANDUM |

## FACTS

Defendant, LOJY AIR COMPANY ("LOJY"), is an Egyptian company that was created in response to an unmet need for air charter services in the Egyptian market. LOJY planned to purchase three airplanes to be used for commercial flights between Gulf countries and Egypt, as well as between European countries and Egypt. At the time, the other seven charter companies had problems with inexperienced pilots, low maintenance standards, aging aircraft, cash flow problems, mismanagement, and lack of quality control that contributed to several crashes and liquidation of two charter operators. With a staff made up of experienced pilots and managers, LOJY was in a prime position to capture at least 15% of the Egyptian air charter market, once it

obtained aircraft for use in its business. The first aircraft was to be obtained by way of a lease-purchase agreement, and allow the business to generate enough revenue to obtain the other two aircrafts, which would be operated on a dry-lease basis.

In or around February 2009, LOJY came into contact with GLOBAL FINANCING & LEASING, INC. ("GLOBAL") through its authorized representative, Emmanuel Ballesteros. At the time, GLOBAL advertised that it "leases and finances worldwide for corporate and commercial aircraft and helicopters, specializing in new and start-up airlines." Richard Keith Ward ("Keith Ward") is the principal and, although unknown to LOJY at the time, the sole owner and operator of GLOBAL. In order to facilitate financing of an aircraft for use in its business, LOJY provided GLOBAL (through its representative, Mr. Ballesteros) with financial and other information, including feasibility studies and business plans.

With the assistance of Mr. Ballesteros, LOJY found an aircraft for use in its business; the Airbus A320, Serial Number 662 ("SN 662") was owned by AAR, its sale was to be brokered by Philippines Aeropartners, Inc. ("PAP"), and GLOBAL was to finance the purchase and lease the aircraft to LOJY. AAR was to sell SN 662 to GLOBAL, who would then finance the sale of the aircraft to PAP, who would then in turn sell (via a lease-purchase agreement) the aircraft to LOJY and use the funds collected from LOJY pursuant to that agreement in order to pay GLOBAL for financing the purchase. The amount that GLOBAL was to finance for the purchase from AAR was $22,950,000. Of the purchase price, $3,400,000 was to be set aside in a reserve fund for future engine maintenance costs, since the engines on the aircraft were an older model that generally required more maintenance than later model engines. Because SN 662 was being wet-leased to another company during this stage of negotiations, the parties planned to deliver the aircraft in January 2010. GLOBAL sent PAP a Letter of Intent ("LOI") confirming its intent to finance and acquire SN 662 from AAR in July 2009. At this time, none of the parties save GLOBAL knew that the company lacked assets or any other method of financing such a purchase.

Once PAP and LOJY drafted and executed a Lease-Purchase agreement for the aircraft, LOJY applied for the certifications and Air Operator Certificate ("AOC") required by Egyptian law. LOJY also visually inspected SN 662 in Paris, France. Once the agreement was executed, LOJY paid a security deposit of $300,000 directly to GLOBAL as had been agreed to by the parties. On November 9, 2009 GLOBAL told LOJY that it would send all required

documentation to the proper Egyptian authorities once the security deposit was paid. PAP stated that, once the security deposit was paid to GLOBAL, the Philippines Department of Foreign Affairs could authenticate the Purchase-Lease agreement between PAP and LOJY, allowing the deal to continue moving forward. Relying upon these representations, LOJY paid $300,000 directly to GLOBAL. Later that November, LOJY received a temporary AOC from the ECAA.

In December 2009, GLOBAL hired Morten Beyer & Agnew ("MBA") to conduct an appraisal of SN 662. Despite mislabeling the aircraft and acknowledging that no on-site inspection of the aircraft or its maintenance records had taken place, the appraisal used maintenance records offered by GLOBAL to value the aircraft. MBA valued the aircraft at $18,440,000 (Current Base Value) and $16,490,000 (Current Market Value). When the appraisal was done, MBA defined "Current Market Value" as the term is defined by the Appraisal Program of the International Society of Transport Aircraft Trading ("ISTAT"), the organization that establishes certification programs for expert appraisers. As used by MBA, "Current Market Value" is defined as "the appraiser's opinion of the most likely trading price that may be generated for an asset under market circumstances that are perceived to exist at the time in question, assuming that the asset is valued for its highest, best use, and the parties to the hypothetical sale transaction are willing, able, prudent, and knowledgeable and under no unusual pressure for a prompt transaction." Significantly, the appraisal conducted by MBA did not use, discuss, or define the term "liquidation value" or "orderly liquidation value" with respect to the value of SN 662.

On or about December 12, 2009 PAP informed GLOBAL that LOJY was running out of time to meet its Civil Aviation Authority deadline, and inquired whether GLOBAL was planning to make the $1,000,000 deposit to purchase SN 662. Despite having no legal department or other employees besides Keith Ward, GLOBAL responded by claiming that its "attorneys were working on the documentation" and that it could not make any deposits until "such time as our Counsel gives final approval, and LOJY and PAP are irrevocably bound to the transaction and the Aircraft." GLOBAL also demanded additional collateral or guaranty to make up for the difference between the purchase price and the Current Market Value of the aircraft, despite the $3,400,000 reserve fund that had been contemplated at the time that the purchase price was negotiated.

Page 3 – LOJY AIR COMPANY TRIAL MEMORANDUM

Griffin Law Group LLC
One World Trade Center

On or about December, 22, 2009, and facing possible loss of its ECAA certification due to GLOBAL's delays, LOJY again attempted to speed the transaction along by asking that the parties meet to finalize the purchase of SN 662 or rescind the agreement. On or about December 29, 2009 PAP informed Keith Ward that LOJY was unhappy with the delays and GLOBAL's attempt to renegotiate the purchase price because such a discussion "should have been done long ago, and not at the end after Lojy [sic] has made its deposit, and making useless our signed LPA with Lojy [sic]." PAP also expressed its confusion about the need to negotiate the price in light of the fact that GLOBAL had already offered, and LOJY had already accepted, financing in the amount of $22.950M. PAP gave Keith Ward 12 hours to "put everything in order with AAR [the seller]. After that, [LOJY] will demand the return of their deposit, ending the deal with PAP and GLFI [GLOBAL]."

As he had done before, and despite the fact that GLOBAL has neither a Board of Directors nor a legal department, Keith Ward informed PAP that the deal was awaiting review and approval by GLOBAL's Board and legal counsel. Keith Ward also, for the first time, announced that GLOBAL would only finance 90% of the Current Market Value, for a proposed financing amount of $18,541,000. If AAR would not agree to lower the price, GLOBAL required that LOJY guaranty additional collateral to make up the difference between the purchase price and the amount that GLOBAL was willing to finance. As a result of this revelation, on or about January 5, 2010 LOJY notified all relevant parties that the deal to purchase SN 662 had failed, and requested its security deposit be refunded accordingly. Even Mr. Ballesteros, GLOBAL's representative, expressed concerns that the deal had failed because the appraisal was based on a "very low condition of the aircraft resulting in a low appraisal", which in his opinion was not accurate.

At this time, LOJY was still unaware that Keith Ward was the whole of GLOBAL, nor was it aware that GLOBAL lacked the assets to finance a multimillion dollar aircraft purchase; if it had known, it certainly would not have entrusted its operating capital to GLOBAL to be applied towards such a purchase. But since it had already given GLOBAL a $300,000 security deposit, LOJY tried again to procure an aircraft with GLOBAL financing so that it could begin operating its air charter business. In January 2010, again with the assistance of Mr. Ballesteros, LOJY located another Airbus A320-200, Serial Number 630 ("SN 630") and began to work with GLOBAL to secure direct financing so that LOJY could purchase it.

On or about January 13, 2010 GLOBAL sent LOJY another LOI regarding the purchase of SN 630. Although it used the exact same format as the LOI which had applied to the SN 662, LOJY responded by proposing additional language regarding the return of the $300,000 security deposit "if a deal can not be reached without any deduction", the location where the aircraft was to be delivered, and clarifying that the LOI expressed the intent to enter into a lease-purchase, not option-to-buy, agreement.

On or about January 15, 2010 GLOBAL responded by sending LOJY a new LOI which expressed its belief that the LOI for SN 630 would be on "the same terms as those we had with PAP." On or about January 21, 2010 LOJY proposed that the LOI be modified to expressly state that LOJY would not "be required to provide any further guarantee", as well as designating "English law" as controlling the agreement. On or about January 25, 2010 GLOBAL provided a newly revised LOI to LOJY, which was executed by both parties.

The LOI which both parties executed outlines the terms under which GLOBAL agreed to lease SN 630 to LOJY. It states that, upon acceptance of the terms set within, "Lessor will prepare a draft of the definitive lease-purchase agreement which will contain the terms set forth herein and other terms customarily used by Lessor for aircraft of this type." Furthermore, the LOI left the amount to be financed by GLOBAL "to be determined" and "subject to final inspection, appraisal and approval by [GLOBAL]", at which time LOJY and GLOBAL would execute a lease-purchase agreement. Finally, the LOI stated that LOJY, upon execution of the lease-purchase agreement, "will bind itself to fulfill the conditions to and take delivery of the aircraft under the lease-purchase agreement." In accordance with this agreement, LOJY agreed to allow GLOBAL to retain the $300,000 it had paid towards the first, failed purchase and apply it to the purchase of SN 630. The LOI provided for the deposit to be returned in the event that the lease-purchase agreement was not consummated due to the fault of GLOBAL.

However, no such lease-purchase agreement was ever drafted, even though the LOI executed by the parties contemplated it in several places (including one provision that read "the Security Deposit will be for the sole use of the Lessor [GLOBAL] during the Lease-purchase agreement term..."). Keith Ward continued to mislead LOJY as to the true nature of GLOBAL's operations by including a provision in the LOI that "Lessor's agreement to lease is subject to final Board of Directors and legal counsel approval," despite the fact that GLOBAL had neither a Board of Directors nor legal counsel.

Having been burned before, LOJY told GLOBAL that it would not conduct an inspection of SN 630 until an agreement regarding purchase price could be reached with the seller. Subsequently, GLOBAL retained a new company, AVITAS, Inc., to conduct an appraisal of SN 630. AVITAS issued its appraisal on February 16, 2010 and offered three valuations. The first appraised the "Base Value" of SN 630 as $18.8M, the "Current Market Value" as $16.9M, and the "Orderly Liquidation Value" ("OLV") as $15.2M.

OLV, according to AVITAS, is the net value after factoring in brokerage fees, storage costs, and other associated fees against the market value of the aircraft. AVITAS admits that OLV is not a value that is defined or recognized by ISTAT, the organization that sets out standards for use by expert appraisers. Even among those authorities that do recognize OLV, it is generally used to value equipment that must be liquidated in pieces rather than as a whole unit; not working, operational aircraft fit for use in an air charter business. OLV is generally used within the industry to value an item that the seller is motivated to liquidate in pieces, as opposed to an item that will be operated within a commercial business model. Not only did AVITAS provide a valuation that is not an ISTAT defined term, it did so without any analysis or report as to how such costs were calculated before subtracting them from the value of SN 630. Nor did AVITAS take into consideration the fact that SN 630 was equipped with newer engines than are only found on 52 out of the 2,154 Airbus A320-200 fleet in-service; although this is noted in the appraisal, there is no explanation of how newer engines would affect the value of SN 630. By subtracting "liquidation costs" from the market value of SN 630, and ignoring the updated engines present on the aircraft, AVITAS submitted a valuation that was less than the seller's asking price.

In response to AVITAS' report, GLOBAL told LOJY that it would only finance the purchase of SN 630 up to the OLV; LOJY would have to provide additional collateral or a guaranty to make up the difference. On February 22, 2010 (six days after the appraisal was issued) Mr. Ballesteros (GLOBAL's representative) told GLOBAL that SN 630 was being inspected at a cost to the owner of approximately $2M; that the aircraft had "-5b" engines "which is not normal" on that type of aircraft; and that the report issued by AVITAS "is not based upon actual but something else as if they don't want to make a report so that the deal will be unsuccessful [sic]." Mr. Ballesteros further stated that, if GLOBAL were to repeat this situation with 100 more aircraft, it could never make a single sale. He urged GLOBAL to submit

a proposal to buy SN 630, either for the asking price of $17.5M or even the OLV price. Finally, Mr. Ballesteros notified GLOBAL that failure to submit such a proposal by the next afternoon would result in a demand for a return of LOJY's security deposit and rescission of the contract.

On February 24, 2010 GLOBAL again expressed its intent to finance the purchase of SN 630, but only up to the amount of the OLV, leaving LOJY to cover the difference via a pledge of collateral or other security. Again, despite its lack of assets or any ability to finance the $15.2M OLV, GLOBAL represented that it was willing and able to finance the purchase of SN 630 up to the amount of the OLV. The next day, Mr. Ballesteros told GLOBAL that he was attempting to get LOJY to agree to an 24-hour extension to try and consummate the purchase of SN 630 and again asked GLOBAL to make an offer to the seller for the OLV price. Additionally, he told GLOBAL that, through negotiations, it might be possible to negotiate a purchase price in between the asking price and the OLV price arrived at by AVITAS. Mr. Ballesteros also expressed his concern that failure to even offer to purchase SN 630 "is not right". LOJY concurred, stating that it would be willing to purchase SN 630 for $16.9M, halfway between the asking price and the OLV price.

In response, on February 26, 2010 GLOBAL stated that "your termination declaration on 2/24 triggered your account being sent to legal for processing....I must await their clearance before proceeding with any further offers." GLOBAL made this statement with full knowledge that, not only did it lack a "legal" department to process anything, it had never made any offers at all. Unaware that Keith Ward comprised the whole of GLOBAL's workforce, LOJY contacted him and asked him to expedite processing through the legal department. Yet again, Keith Ward failed to mention that there was no such department; instead, on February 27, 2010 he replied that he had "requested the legal department expedite their review, but they are a completely separate entity, and I really have no control over what they do."

On March 4, 2010 Mr. Ballesteros again contacted GLOBAL and asked whether the deal could be completed. He reminded GLOBAL that LOJY had already paid a security deposit and asked that GLOBAL help LOJY find an aircraft that GLOBAL would agree to finance. Mr. Ballesteros explained that a price range of $17-19M was to be expected for the type of aircraft that LOJY was considering, and that "my contacts have high value aircraft, but at the end it will never pass your valuation."

In fact, GLOBAL did finally make an offer to purchase SN 630 on March 3, 2010 for the OLV price ($15.2M). However, the LOI included many delivery conditions that the seller was to bear the cost of. The seller, believing GLOBAL's offer was "not serious", submitted a counter-offer of $17.525M. Upon receipt of the counter-offer, GLOBAL renewed its demand for a bank guarantee to make up the difference between the OLV price and the asking price. On March 8, 2010 GLOBAL again represented that it was willing and able to finance $15.2M for the purchase of SN 630, when it lacked the assets and/or resources to do so.

When GLOBAL renewed its demand for a bank guarantee to make up the difference between the asking price and the OLV, LOJY realized that the deal was never going to be consummated and asked for the $300,000 security deposit to be returned. GLOBAL responded by claiming that LOJY was in breach of their agreement and that it was therefore entitled to retain the entire amount. According to GLOBAL, LOJY breached the LOI when it "failed and refused" to find a suitable aircraft for GLOBAL to lease to it, and when it "failed and refused" to obtain a bank guarantee for the difference in asking price and OLV price. As a result of this perceived failure and refusal, GLOBAL claimed that the purchase was not consummated through no fault of its own and it was therefore entitled to retain the security deposit. GLOBAL also argued that it could keep the deposit as "liquidated damages" pursuant to the Lease-Purchase agreement that was neither drafted nor executed by the parties. As if this were not enough, GLOBAL also attempted to disavow its own representative, Mr. Ballesteros.

Even so, LOJY continued to attempt to locate an aircraft that GLOBAL would agree to purchase, because it believed that GLOBAL still had possession of its operating capital. In fact, GLOBAL (acting by and through its principal, Keith Ward) no longer has possession of LOJY's security deposit; the funds have been converted and used inconsistently with their intended purpose (purchase of an aircraft for use by LOJY in an air charter business). GLOBAL then filed a putative declaratory judgment action against LOJY in Oregon state court, ostensibly to establish that GLOBAL was entitled to retain LOJY's security deposit. LOJY properly removed the suit to this Court.

## POINTS AND AUTHORITIES

Based upon the above facts, LOJY asserts the following counter-claims against GLOBAL, as well as claims against Keith Ward, individually in this lawsuit:

## I. Conversion

A conversion occurs when one party intentionally exercises dominion and control over the property of another, which is so serious an interference with the rights of the owner that the actor must pay to the other its full value. *Mustola v. Toddy*, 253 Or. 658 (1969). When determining whether the exercise of dominion and control over chattels is sufficient for the actor to pay its full value, the courts look to six factors: 1) length and extent of dominion and control; 2) the actor's intent; 3) the actor's good faith, or lack thereof; 4) length and extent of the interference with the rights of the other; 5) the harm done to the chattel; and 6) the expense and inconvenience caused by the actor's wrongful exercise of dominion and control. *Id.* at 664.

Generally, a suit for conversion will lie if "the money was wrongfully received by the party claiming conversion, or an agent is obligated to return specific money to the person claiming it." *Waggoner v. Haralampus*, 277 Or. 601, 604 (1977). Even if the actor gains control over the property of another by lawful means, if he continues to exercise dominion and control even after a demand is made for the return of the property, he is liable for conversion. *Leibrecht v. Hawkins*, 83 Or. App. 396 (1987). In *Leibrecht*, the plaintiff was skydiving when he lost a parachute over the defendant's land. *Id.* at 398. The plaintiff attempted to enter the defendant's land to retrieve his property but was prevented from doing so by the defendant's father. *Id.* The plaintiff contacted the sheriff, who attempted to recover the parachute from the defendant, but the defendant refused to return it, stating that it had been taken by someone else. *Id.* at 399. Despite the fact that he did not gain possession of the plaintiff's property by unlawful means, the defendant's refusal to return the property once the plaintiff requested that he do so was sufficient to constitute conversion of that property. *Id.*

Here, GLOBAL'S continued unlawful retention of the unearned $300,000 security deposit, despite repeated demands to return it to LOJY, constitutes conversion.

## II. Unjust Enrichment

A party is unjustly enriched when a benefit has been conferred upon another, the other party is aware of that benefit, and retention of the benefit would be unjust to the party who conferred it. *Jaqua v. Nike*, 125 Or. App. 294, 298 (1993). Retaining a benefit is unjust when 1) the plaintiff reasonably expected to be paid for it; 2) the defendant should have known that he would

have to pay for the benefit; or 3) there is a social and reasonable expectation that payment would be made for the benefit under the circumstances. *Id.*

For example, in *LQ Development v. Mallory*, two parties entered into a contract to purchase land. 98 Or. App. 121 (1989). Five acres of land cost $250,000 and the purchaser paid a $50,000 deposit before taking possession of the property. *Id.* at 123. The contract contained a provision which provided that "the parties hereto agree to enter into An Addendum to this Contract" to purchase several additional parcels that were to be sold to the purchaser in the future. *Id.* The addendum was not executed, nor were the parcels sufficiently identified within the contract that was executed, but the purchaser made payments towards the parcels for years. *Id.* Additionally, while the purchaser took possession of the land, no deed was ever executed transferring the five acres that were purchased pursuant to the executed contract. *Id.* After having paid over $248,000 to purchase the property, the purchaser's successor in interest initiated a claim against the seller's successor in interest to recover all of the monies paid to the seller for the land that was never transferred to the purchaser. *Id.* at 125. Keeping the benefit received pursuant to the failed contract was, accordingly, unjust enrichment and the seller was obligated to return the money paid by the purchaser. *Id.* at 124.

Here GLOBAL'S has received the benefit of LOJ's $300,000 security deposit, yet has not performed its obligations under the LOI. GLOBAL has, in fact, worked directly against LOJY in regard to fulfilling its obligations under the contract (i.e., to provide financing) by twice intentional ordering low ball aircraft appraisals that would automatically fail to support GLOBAL's obligations to secure financing for LOJY to purchase the aircraft.

### III. Fraud Against GLOBAL and Ward.

The elements of fraud are: 1) a representation; 2) that was material; 3) and false; 4) which the speaker knew to be false; 5) which the speaker intended the listener to rely upon; 6) which the listener reasonably relies upon; 7) not knowing that the representation was false; 8) and resulting damage from that reliance. *Musgrave v. Lucas*, 193 Or. 401 (1951). A promise to act in the future may constitute an actionable claim for fraud if the speaker never intended to perform when he made the promise, or if he made the promise with "reckless disregard whether the promisor can or cannot perform the promise." *Sproul v. Fossi*, 274 Or. 749, 753 (1976).

In *Sproul*, the defendant asked the plaintiff to help him invest in chicken futures. *Id.* The defendant asked the plaintiff for $10,000 and told him that he would use the money to purchase chicken futures. *Id.* However, the defendant never made the purchase and did not return the plaintiff's money when requested to do so. *Id.* The defendant told the plaintiff that he would need the money quickly, assured him that he would double his money, and later admitted that he did not in fact purchase the chicken futures as he had promised to do. *Id.* These statements were sufficient to support a finding that the defendant either never intended to purchase the chicken futures as he promised to do, or that he promised to purchase them with reckless disregard for his ability to do so. Accordingly, the defendant's failure to act on his promise was a sufficient basis for a fraud claim. *Id.*

Similarly, the plaintiff in *Elizaga* sued for fraud after he was offered a position that his employer knew or should have known would not exist as of his starting date. *Elizaga v. Kaiser Foundation Hospitals*, 259 Or. 542 (1971). The defendant, a hospital, had a preceptorship for which the plaintiff applied. *Id.* at 544. He was to start work on July 1. However, the hospital learned in April of the previous year that its preceptorship was no longer approved by the Board of Medical Examiners; the defendant applied for an extension and it was granted, but the program was scheduled to terminate the day before the plaintiff was to begin working. *Id.* Despite knowing that the program was no longer approved as of June 30, the defendant failed to tell the plaintiff that the program was scheduled to terminate before the preceptorship was to begin. *Id.* Only three months before the plaintiff was to begin work, the defendant notified him that its preceptorship was no longer approved by the Oregon Board of Medical Examiners, and that he could not begin work. *Id.* at 545. Because the defendant's promise to employ the plaintiff was made with reckless disregard for whether the defendant could perform it, the defendant was liable for fraud and the plaintiff's resulting damages. *Id.*

Here GLOBAL and Ward made direct misrepresentations regarding its intent and its ability to finance aircraft that were identified for lease/purchase by LOJY. GLOBAL and Ward additionally misrepresented the scope of its operations and the amount of financing it would provide. In fact, GLOBAL and Ward intentionally misrepresented the purposes of the aircraft appraisals as being needed to support financing, when in fact, these undervalued appraisals were obtained by GLOBAL in an effort to avoid its duties to finance under the LOI.

4. **Fraud by Nondisclosure Against GLOBAL and Ward.**

Actionable fraud may be committed by a concealment of material facts as well as by affirmative and positive misrepresentations. *Ogan v. Ellison*, 297 Or 25, 34 (1984) (quoting *Musgrave v. Lucas*, 193 Or 401, 410 (1951). See also, *Wieber v. FedEx Ground Package System*, Inc. 231 Or App 469, 484-485 (1951). Moreover, a duty to disclose material facts arises when the parties are in a fiduciary relationship, such as here, where GLOBAL held the $300,000 security deposit for the benefit of LOJY.

Ward and GLOBAL failed to disclose: 1) it was not a financing company; 2) that it lacked any monetary resources to provide the type of financing that it indicated it could provide; 3) that it relied upon outside private equity resources to obtain financing for its clients; 4) that it would fully finance an aircraft; 5) that it would finance only the orderly liquidation value for an aircraft, and 6) that it never intended to finance an aircraft for LOJY.

### 5. Fraud in the Inducement Against Ward and GLOBAL

The elements of fraud in the inducement are the same as the elements of fraud set out above. Fraud in the inducement additionally offers a choice of remedies of either contract damages or the rescission of the contract. Here, the Ward and GLOBAL misrepresented its capabilities as a financing company, the amount of financing it would provide, that it relied upon private equity sources for financing, that the $300,000 was a security deposit and the role of appraisal in obtaining aircraft financing.

### 6. Breach of Contract Against Global.

An unjustified failure to perform fully is a breach of contract. *Kantor v. Boise Cascade Corp.*, 75 Or App 698, 703 (1985).

Here GLOBAL breached its contract obligations by failing to obtain financing for LOJY and by failing to return LOJY's $300,000 security deposit.

### 7. Breach of the Implied Covenant of Good Faith and Fair Dealing Against GLOBAL.

This covenant implies that neither party will engage in any act that will "have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Perkins v. Standard Oil Co.*, 235 Or 7, 16 (1963) (quoting 3 Arthur Linton Corbin, Corbin on Contracts §561, at 278 (1960). Here, GLOBAL breached the implied covenant when it ordered appraisals on the aircraft which would automatically fall below the value of the aircraft and result in a failure to consummate the transaction so that GLOBAL could retain the $300,000 security deposit. It, in short, acted to deny LOJY the fruits of the contract.

### 8. Alter Ego/Piercing the Corporate Ego Against Ward.

Under Oregon law a shareholder of a corporation may be held liable for apparent corporate actions when: 1) the shareholder actually controlled the corporation; 2) the shareholder engaged in improper conduct in the exercise of control over the corporation, and; 3) the shareholder's improper conduct resulted in harm to the plaintiff. In this case, the individual shareholder can be held liable for what would

normally corporate liabilities. See, ORS 60.151; *Amfac Foods v. Int'l Systems*, 294 Or 94, 108-09, 112 (1982).

Here Ward is the sole shareholder of GLOBAL,. Ward utilized GLOBAL for the purposes of committing and perpetrating a fraud on LOJY. GLOBAL, in fact, lacked the capitalization, contacts, employees and resources needed for a company conducting high value aircraft financing and leasing operations. GLOBAL could never meet its obligations under the LOI, and consequently its obligations and liabilities became those of Ward, its lone shareholder.

DATED THIS 7th OF FEBRUARY 2014.

GRIFFIN LAW GROUP, LLC

Philip S. Griffin, OSB #872322
Attorneys for Defendant/ Counterclaimant Lojy Air Company.
World Trade Center One
121 SW Salmon St., Suite 1100
Portland, OR 97204
Tel. 503.471.1306
Fax. 888.543.4806